## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CINDY I. WAUGH, | ) | CASE NO. 8:09CV469 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("Act") Act, 42 U.S.C. §§ 1381, *et seq.* The Court has carefully considered the record and the parties' briefs (Filing Nos. 16, 22).

### PROCEDURAL BACKGROUND

The Plaintiff, Cindy I. Waugh, filed for SSI benefits on April 18, 2005. (Tr. 48-51.) The claim was denied initially and on reconsideration. (Tr. 25-41.) An administrative hearing was held before Administrative Law Judge ("ALJ") Marsha Stroup on July 16, 2007.[1] (Tr. 374.) On August 30, 2007, the ALJ issued a decision finding that Waugh is not "disabled" within the meaning of the Act and therefore is not eligible for SSI benefits. (Tr. 27.) On October 29, 2009, the Appeals Council denied Waugh's request for review. (Tr. 4-7.) Waugh now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").

---

[1] Judge Stroup presided over the video-teleconferenced hearing from Kansas City, Missouri, and the Claimant appeared in Omaha, Nebraska. (Tr. 338.)

Waugh claims that the ALJ's decision was incorrect because: 1) the ALJ did not properly credit her testimony; and 2) the ALJ's conclusions are not supported by substantial evidence on the record as a whole.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Waugh alleges that her disability began on February 14, 2005, and is based on pain, weakness, fatigue, severely limited physical activity; inability to drive, and difficulty eating and digesting food.  (Tr. 48, 59, 111.)

### *Pre-Hearing Documentary Evidence*

In February 2005, Waugh was hospitalized with complaints of nausea and vomiting. (Tr. 125-37.)  An abdominal CT scan revealed a pancreatic mass.  (Tr. 127, 135.)  Waugh underwent a Whipple procedure[1] for the benign pancreatic mass.  (Tr. 125, 145.)  During her hospitalization, Waugh was also diagnosed with a stenosis in her celiac artery.  It was decided not to stent the artery during this hospitalization.  (Tr. 145.)  In April 2005, Waugh still experienced abdominal pain from the stenosis, and on April 27, 2005, she underwent angioplasty and stenting of the celiac artery.  (Tr. 147.)

In May 2005, Waugh returned to oncologist Aaron Sasson, M.D., for followup as a result of her Whipple procedure.  Although Waugh reported having abdominal discomfort,

---

[1] The Whipple procedure is a surgery to treat pancreatic cancer during which the head of the pancreas, parts of the bile duct and duodenum, and the gall bladder, and sometimes a part of the stomach are removed.
http://www.mayoclinic.org/whipple-procedure/about.html.

2

particularly after eating, she admitted she was no longer taking her prescribed pancreatic enzymes. Dr. Sasson counseled Waugh regarding proper dietary modifications and the need for pancreatic enzyme supplementation, and he recommended that she return in one month. (Tr. 176.)

In June 2005, Waugh saw rheumatologist Paula Abramovith, M.D., for followup regarding her autoimmune pancreatitis. Waugh reported continued problems with abdominal pain and, when she eats, producing liquid and greasy stools. (Tr. 261.) Dr. Abramovith referred Waugh to gastroenterology, indicating that there was no level of disease activity to warrant more aggressive treatment. Dr. Abramovith noted that, although Waugh had lost weight initially with her illness, she recently had gained three pounds. (Tr. 262-63.)

In June 2005, Waugh told Dr. Sasson that she was feeling much better, her diarrhea had improved, and her appetite had increased. Waugh had recently begun steroid therapy. Dr. Sasson recommended followup in three months. (Tr. 173.)

Also in June 2005, a state agency reviewing physician, Donald Larson, M.D., opined that he expected Waugh to recover from her pancreatic impairments within twelve months, allowing her to perform a wide range of light work. (Tr. 153-60.) He believed that Waugh would be able to: lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, and walk six hours each in an eight-hour workday; push/pull without limitation; frequently balance; and occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. Dr. Larson noted that Waugh should never climb ladders, ropes, and scaffolds. (Tr. 154-55.) Dr. Larson stated that Waugh should avoid concentrated exposure to extreme heat and cold, wetness, vibration, fumes, odors, dusts, gases, poor ventilation, and

3

hazards including machinery and heights.  (Tr. 157.)  In August 2005, state agency physician J. A. Reed, M.D., affirmed Dr. Larson's opinion.  (Tr. 166.)

In October 2005, Waugh saw vascular surgeon Jason M. Johanning, M.D., for followup after her angioplasty and arterial stenting.  Waugh told Dr. Johanning that she continued to have significant problems with her bowels.  Dr. Johanning indicated, however, that Waugh's celiac artery had no effect on her bowel symptoms.  He planned to followup with Waugh in one year.  (Tr. 171.)

In December 2005, Waugh saw gastroenterologist Grant Hutchins, M.D., for evaluation.  (Tr. 280.)  Waugh reported that she was feeling better, her stools were well formed, and she was no longer having any abdominal pain.  She had no complaints.  (Tr. 280.)  Dr. Hutchins noted Waugh had gained six pounds since her last visit, and her stool frequency had decreased.  Waugh had been taking Pangestyme, an enzyme used to improve digestion and prevent frequent, fatty, foul-smelling bowel movements in persons suffering pancreatitis. (Tr. 280; http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000279).

In January 2006, Waugh returned to Dr. Sasson for followup.  Although she reported having "some" nausea and pain in her left side and mid-back, Waugh stated that her stools had improved.  Waugh had gained weight since her last visit.  Dr. Sasson ordered lab studies and told Waugh to return in three months.  (Tr. 170.)

In February 2006, Waugh underwent an esophagogastroduodenoscopy ("EGD") based on her symptoms of intermittent abdominal pain and diarrhea.  The EGD revealed normal appearing anatomy and small intestinal mucosa, mildly erythematous gastric remnant, normal gastroesophageal junction, and white plaque-like lesions consistent with

candida esophagitis.  (Tr. 168.)  Dr. Hutchins recommended treatment of her infection with Diflucan.  (Tr. 169.)

In April 2006, Waugh returned to Dr. Sasson for followup.  Waugh told Dr. Sasson that she was doing well and eating well without nausea or vomiting.  She reported intermittent abdominal discomfort related to her bacterial infection that was being treated and had some intermittent abdominal pain.  However, she stated that her pain resolved with medication.  (Tr. 167.)

In June 2006, Waugh saw gastroenterologist Renee Young, M.D., for evaluation. (Tr. 275.)  Waugh reported that she continued to have some "loose, greasy, foul-smelling stools from time to time, so much so that she alters her lifestyle." (Tr. 275.) She told Dr. Young that she had some improvement when taking antibiotics, but that her symptoms worsen immediately when she stops her medication.  (Tr. 275.)  Dr. Young prescribed an antibiotic regimen.  (Tr. 276-77.)  Dr. Young noted that Waugh was taking her pancreatic enzyme replacement regularly.  (Tr. 277.)

On August 16, 2006, Waugh saw rheumatologist Ryan Martin, M.D., for followup on her autoimmune pancreatitis.  (Tr. 256.) She stated that her diarrhea was stable and very predictable and associated with specific foods that she knows she should avoid.  Waugh said she was having no problems and did not need further therapy.  She was instructed to slowly taper off her Prednisone.  (Tr. 257.)

Two weeks later, on September 1, 2006, Waugh saw gastroenterologist Kimberly Harmon, M.D., with complaints of diarrhea that persisted despite pancreatic enzymes and a trial of antibiotics.  (Tr. 271.)  Waugh's weight was up 2.7 pounds since her last visit to the clinic.  (Tr. 272.)   Dr. Harmon opined that Waugh's complaints were related to

5

pancreatic insufficiency, and that her symptoms were controlled as long as she took the appropriate enzymes. (Tr. 274.) Waugh told Dr. Harmon that she was seeking disability, and Dr. Harmon told her it was "highly doubtful" she would qualify for disability benefits because she did not meet the requirements described by her lawyer in a recent letter. (Tr. 273.)

On December 6, 2006, Waugh saw rheumatologist Mikala Albertson, M.D., to followup with her autoimmune pancreatitis. (Tr. 254-55.) Waugh told Dr. Albertson that she had been off steroids for about two months, she continued to have problems with unpredictable diarrhea and abdominal pain, and her symptoms were "mildly worse" after stopping her medication. Overall, Waugh's condition was stable and her concerns were minor. (Tr. 254.)

Two days later, on December 8, 2006, Waugh returned to Dr. Harmon with continued complaints of "horrible diarrhea" for the last two days. She reported that she had stopped taking her prescribed medication "on her own" because it was causing constipation, and she worked at the restaurant the previous day despite her diarrhea. (Tr. 267.) Dr. Harmon encouraged Waugh to start back on her medication, but Waugh "adamantly refuse[d]." (Tr. 268.) Moreover, although Dr. Harmon believed Waugh's diarrhea was most likely caused in part by bacterial overgrowth, Waugh reiterated that she will not take cyclical antibiotics because she cannot visit the tanning bed and while on antibiotics. Based on her refusal to take other medications, Dr. Harmon prescribed Imodium, which can cause constipation. (Tr. 268.)

6

In March 2007, Waugh returned to Dr. Harmon for followup.  (Tr. 290-92.) Although Waugh reported some continued problems with diarrhea, she was content with her bowel habits and she refused to try antibiotics that would prevent her from tanning.  (Tr. 290-92.)

In April 2007, Waugh saw rheumatologist David Stearnes, D.O.  Waugh's appetite was stable and she had gained a little weight.  She accepted that she would experience continued problems with transient abdominal pain and intermittent diarrhea because of her Whipple procedure, and she stated that her symptoms were "mostly manageable."  (Tr. 288.)  An examination also revealed no clinical evidence of pancreatitis or pancreatic inflammation.  Dr. Stearnes recommended a followup visit in six months.  (Tr. 289.)

In June 2007, Dr. Harmon opined that, from a gastrointestinal standpoint, Waugh had no limitations with sitting, standing, walking, lifting, range of motion, pushing, pulling, climbing, balancing, stooping, kneeling, crouching, crawling, or reaching.  Instead, Dr. Harmon stated that Waugh's activities are limited only insofar as Waugh experiences severe diarrhea or abdominal pain.  Dr. Harmon noted that clinic notes reveal only intermittent complaints.  (Tr. 287.)

***Plaintiff's Testimony***

Waugh testified that she was forty-nine years old at the time of the hearing.  She lived in a house with her mother.  She had never married, but she had a daughter who was twenty-three at the time of the hearing.  (Tr. 341-42.)  Waugh graduated from high school and had not received further education.  She had a driver's license and drove a car.  (Tr. 342.)  She drove herself to work.  (Tr. 358.)  Waugh testified that she was five feet, two inches tall.  Although before her surgery she weighed between 130 and 135 pounds, at the time of the hearing she weighed approximately 115 pounds.  She described her weight as

7

"fairly" stable.  (Tr. 346.)  At the time of the hearing, Waugh smoked approximately five cigarettes daily.  (Tr. 347.)

Waugh began working as a waitress in a small diner in August 2004. (Tr. 343, 356.) In February 2005, she took time off due to her illness.  She resumed her job in August 2005.  Since then she continued to work approximately thirty hours weekly. (Tr. 343.) She testified that her employer allowed her to use the bathroom as needed and for extended periods of time as needed.  Waugh testified that she had not had a lot of absences due to her disease because she was able to prepare ahead of time for her hours spent at work. (Tr. 344.)  Waugh testified that she had also worked as a hand packager in a coffee factory.  (Tr. 345.)

With respect to the cost of her prescription medications, Waugh received assistance through Douglas County, Nebraska, and through prescription assistance programs.  (Tr. 347.)

Waugh stated that she first saw a doctor for problems related to her pancreas in 2005.  Initially she had pain in her back and, when she ate, in her stomach.  (Tr. 349.) Testing revealed a benign mass in her pancreas resulting in the Whipple procedure.  She considered herself still in recovery after her surgery, and she saw a gastroenterologist every six months for followup.  She took enzymes and, on a daily basis, Immodium for her symptoms. (Tr. 350.) Waugh testified that her symptoms were diarrhea, "awful" flatulence, a lack of strength, anxiety, depression, and fatigue.  Waugh stated that her diarrhea was usually sudden and required that she wear protection.  Waugh worked four days per week from 9:00 a.m. to 4:00 p.m.  (Tr. 351, 353, 355.)  Her preparation before work involved

getting up three hours before her shift, not eating until 3:00 p.m.,[2] and making sure that she had cleared her bowels before going to work.  Her diarrhea started soon after she would eat.  (Tr. 352.)  Waugh testified that the Immodium did not stop her diarrhea; rather, it lessened the severity and length of time she experienced symptoms.  Waugh testified that she took enzymes to help her digest her food properly and obtain needed nutrients, yet she experienced diarrhea daily.  She described her diet as "[n]o fat."  (Tr. 353.)  However, Waugh stated that she ate cheese and low-fat peanut butter.  She sometimes drank Ensure, a supplement.  (Tr. 354.)  Waugh asked to be taken off her steroids because of side effects that included hair loss and breaking of her teeth.  Waugh also stated she did not want to gain more weight as she would on steroids.  (Tr. 357-58.)  Waugh testified that she had not sought a less demanding job because she did not want to discuss her medical condition and needs with potential employers.  (Tr. 356.)  Waugh took care of her daily activities without help.  She helped her mother with chores, did her own laundry, made her bed, swept floors, and grocery shopped on a daily basis.  After work, she showered, ate dinner, and watched television from her bed.  She had no activities, hobbies, or friends other than a boyfriend.  (Tr. 358-60.)  She testified that she used to cross-stitch, go to the gym, jog, run on a treadmill, walk dogs, and go boating, jet skiing, water and snow skiing.  (Tr. 359.)  She ate out a couple of times weekly with her boyfriend.  (Tr. 360.)  Waugh was not asked when she went to sleep, but she testified that she woke up at about 3:00 a.m. to use the bathroom.  Sometimes she got what she considered "enough" sleep.  (Tr. 361.) She got up at about 6:00 a.m.  (Tr. 352.)

---

[2]Waugh did not say whether she eats when she gets up in the morning.

9

Waugh took an extra set of clothes with her to work for use if she soiled herself.  (Tr. 361.)  Out of her seven-hour work day, she estimated that she spent one hour in the bathroom.  She estimated that her trips to the bathroom lasted five minutes, at a minimum, to as much time as she needed depending on the circumstances.  (Tr. 362.)  Waugh stated that she earned less at the same job now than she did before her illness because now she cannot handle as many tables and customers.  (Tr. 363-64.)

***Vocational Expert's Testimony***

The ALJ asked the vocational expert ("VE"), Deborah Determan,[3] whether there were any types of employment that would allow Waugh to take the kind of breaks during her work day that she needed.  The VE responded that jobs that accommodate such breaks are those in which a person works independently or performs functions that, if left for a time, do not completely disrupt production or the activity in question.  Such jobs include sedentary occupations such as photocopy machine operator, document preparer, and cutter and paster.  (Tr. 367.)  The VE opined that such jobs are available in significant numbers in the local and national economies.  (Tr. 366-67.)  The VE explained that by taking necessary breaks, Waugh would be rearranging her lunch hour and regular break times totaling approximately one hour.  (Tr. 369-70.)

## THE ALJ'S DECISION

After following the sequential evaluation process set out in 20 C.F.R. § 416.920, the ALJ concluded that Waugh is not disabled.  (Tr. 19.)  Specifically, at step one the ALJ

---

[3]Ms. Determan's curriculum vitae is in the record.  (Tr. 42-44.)

found that Waugh has not engaged in substantial gainful work activity at any time relevant to this case.  (Tr. 15.)

At step two, the ALJ found that Waugh had the following medically determinable "severe" impairments: residual effects of history of pancreatic mass; and autoimmune pancreatitis.  (Tr. 15.)  The ALJ found that Waugh's impairments cause "significant limitation" in Waugh's ability to perform basic work activities.  The ALJ recognized that the record describes treatment for hypertension and a mood disorder.  However, Waugh's hypertension is controlled by medication and her mood has improved.  Therefore, the ALJ noted that Waugh's hypertension and mood disorder cause no more than mild limitations and, therefore, are not severe.  (Tr. 15.)

At step three, the ALJ concluded that Waugh does not have an impairment or combination of impairments that equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").

At step four, the ALJ found that Waugh has the residual functional capacity to perform sedentary work.  The ALJ explained that she did not find Waugh's statements entirely credible with respect to her symptoms.  The ALJ also found that Waugh is unable to perform any of her past relevant work.

At step five, the ALJ determined that Waugh can perform sedentary work as described and that such jobs exist in significant numbers in the local and national economies.  In conclusion, the ALJ concluded that Waugh is not disabled.

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*.  *Bates v. Chater*, 54 F.3d

11

529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995).  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision.  *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision.  *Id.*  As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently.  *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### *Claimant's Credibility*

Waugh argues that the ALJ improperly discounted her testimony.  Specifically, Waugh argues that the ALJ may only reject her subjective complaints if there are inconsistencies in the record as a whole.  Waugh claims that the record as a whole supports her complaints.

In evaluating subjective complaints, an ALJ must consider: a claimant's prior work history; the duration, frequency, and intensity of the alleged pain; the effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. *Medhaug v. Astrue,* 578 F.3d 805, 816 (8th Cir. 2009) (quoting *Polaski v. Heckler,* 739 F.2d

12

1320, 1322 (8th Cir. 1984)).  If an ALJ discredits a claimant's testimony and states a reasoned basis for doing so, generally the ALJ's credibility determination is respected. *Jones v. Astrue,* 619 F.3d 963, 975 (8th Cir. 2010).  Repeated failure to comply with treatment is a valid reason for discounting a plaintiff's subjective complaints.  *Dodson v. Astrue,* 346 Fed. Appx. 123, 124 (8th Cir. 2009).

In this case, the ALJ very carefully evaluated Waugh's complaints of pain.  She summarized the medical evidence in detail.  The ALJ noted Waugh's complaints of constant fatigue while considering Waugh's daily activities: driving; doing chores at home such as laundry, sweeping, and making her bed; daily grocery shopping; and eating out a couple times per week with her boyfriend.  The duration and frequency of Waugh's symptoms are affected, according to Waugh's own statements to her physicians, by her compliance with a low fat diet and her medication regimen.  As outlined by the ALJ, Waugh admitted several times that she stopped taking her enzymes or refused to take antibiotics because they would interfere with her ability to use a tanning bed.  As Waugh points out, she did take some of her medications.  However, the frequency with which she refused to undertake a recommended medication regimen, despite her own admission that her medications help her symptoms, is striking.  The Court also notes Waugh's apparent concern with her low weight, which is inconsistent with her stated desire not to gain additional weight.  The ALJ thoroughly considered Waugh's functional restrictions and present work situation in light of her symptoms.  In summary, the ALJ considered all of the necessary factors under *Polaski*.

The Court agrees with the ALJ's analysis that Waugh's subjective complaints are largely not credible, particularly in light of Waugh's refusal to take suggested medications and her daily activities.

***Substantial Evidence on the record as a Whole***

As stated above, the ALJ considered the entire record in determining that Waugh is not disabled.  The Court has carefully reviewed the record and concludes that the ALJ's decision is supported by substantial evidence.  The Court has considered Waugh's symptoms, work history, daily activities, medication, and refusal to take certain prescribed medications.  The Court has considered Waugh's statements to her physicians that if she follows her diet and takes her medications, her symptoms are manageable.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 22nd day of December, 2010.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

14